

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**06/26/2009**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 08-36021-H4-7** |
| **RED RIVER ENERGY,** | § | |
| **INC.,** | § | |
| | § | |
| **Debtor.** | § | |

## MEMORANDUM OPINION ON TRUSTEE'S MOTION TO DESIGNATE CRESTVIEW CAPITAL MASTER, LLC AND RUBICON MASTER FUND AS THE ENTITIES RESPONSIBLE TO DISCHARGE DUTIES OF THE DEBTOR UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 9001(5)
[Docket No. 33.]

### I. INTRODUCTION

As a preliminary matter, the Court wishes to express its appreciation for the hard work and professionalism of all counsel for the parties. The clients should know that their respective counsel did excellent work; and this Court's decision, while it will no doubt dissatisfy some, and perhaps all, of the parties, should in no way diminish the superb efforts of the attorneys. The clients should know that each of their counsel did stellar work.

The matter before this Court began with an involuntary bankruptcy petition of a completely defunct corporation bereft of any officers and directors. Because the Debtor is a corporation, a representative of the Debtor must be appointed to fulfill the Debtor's duties.[1] These duties include the responsibility to file schedules and release other information about the Debtor under oath. In the case at bar, these schedules and information are absolutely essential to the administration of the

---

[1]The Debtor's representative, *inter alia*, must file a list of creditors, submit a statement of financial affairs, and appear at the meeting of the creditors. 11 U.S.C. § 521. However, it remains the Chapter 7 Trustee's responsibility to administer the bankruptcy estate.

bankruptcy estate, and this Memorandum Opinion discusses who must serve as the Debtor's representative to ensure that these duties are performed with full disclosure and accuracy.

The Trustee has filed a motion to appoint Rubicon and Crestview, two corporate shareholders who, together, hold the majority of the stock of the Debtor, and have exercised control over the Debtor throughout most of its existence. Conversely, Rubicon and Crestview have sought to avoid the duty of serving as the Debtor's representative, and have instead urged the Court to appoint Gary Burns, the former Chief Restructuring Officer of the Debtor, who resigned four months prior to the filing of the involuntary petition, was never directly employed by the Debtor, and has no personal knowledge of the key transfers and events that the Trustee must investigate in this case. Despite these glaring deficiencies in the appointment of Burns, Rubicon and Crestview continue to encourage his designation so that they may avoid the burden of filing statements of financial affairs and schedules with the Court under oath. However, the Court concludes that this responsibility is appropriately placed on Rubicon and Crestview's shoulders.

## II. FINDINGS OF FACT

1.   In August of 2005, Red River Energy, LLC (RR LLC) was formed under the laws of the state of Delaware. RR LLC's initial members consisted of Rubicon Master Fund (Rubicon), William M. Chandler, Jr. (Chandler), and Lester C. McCormick (McCormick). As of the formation of RR LLC, Rubicon held an eighty percent (80%) interest in this entity and Chandler and McCormick each held a ten percent (10%) interest. [Docket No. 33, ¶ 8.][2]

---

[2] This statement of fact is deemed admitted pursuant to Bankruptcy Local Rule 9013(g)(1). This local rule states, in pertinent part, that "Responses to all other motions are governed by Fed. R. Bankr. P. 7008." This federal bankruptcy rule applies Fed. R. Civ. P. 8(b)(6). This particular rule states that, in pertinent part, "An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." In the case at bar, Rubicon and Crestview failed to admit or deny several specific allegations in the motion that initiated this contested matter. Accordingly, the Court deems the specific allegations in paragraphs 8 through 20 of the

2.  Rubicon is organized under the laws of the Cayman Islands. [Trustee's Ex. 8: Stockholders Agreement, p. 2.]

3.  RR LLC was formed for the purpose of acquiring the assets of Briscoe Rig Corporation (Briscoe), an Oklahoma corporation in the business of providing oil and gas well drilling services.  Thereafter, the business plan was to develop RR LLC into a larger drilling company with an exit strategy of either selling RR LLC or taking it public.  In exchange for their ownership interests, Rubicon was to provide capital for the venture, and Chandler and McCormick were to serve as officers of RR LLC, managing its daily operations and implementing its business plan. [Docket No. 33, ¶ 9]; *see supra* note 2.

4.  On September 26, 2005, RR LLC was incorporated and became Red River Energy, Inc. (the Debtor); the Debtor is also a Delaware corporation.  [Trustee's Ex. No. 1: Certificate of Incorporation of Red River, Inc.]  Simultaneously, Rubicon purchased 52,093 shares of preferred stock in the Debtor for $5,600,000.00,[3]  and Crestview Capital Master, LLC (Crestview) purchased 27,907 shares of preferred stock in the Debtor for $3,000,000.00.  In exchange for their ownership interests in RR LLC, Chandler and McCormick each received 10,000 shares of common stock in the Debtor. [Docket No. 33, ¶ 10]; *see supra* note 2.

5.  Also on September 26, 2005, the Debtor closed on the purchase of Briscoe's assets for $13.2 million (the Briscoe Acquisition).  At the closing, Briscoe was paid $6.6 million in cash and given a $6.6 million note (the Briscoe Note) secured by a lien on substantially all of the

_____

motion as having been admitted.  Because these allegations are admitted, the Court incorporates them as findings of fact.

[3] Rubicon was credited $1.2 million against the purchase price, which was attributable to its initial $500,000.00 capital contribution at the formation of RR LLC and a $700,000.00 term loan made to RR LLC. [Docket No. 33, ¶ 10]; *see supra* note 2.

Debtor's assets. [Docket No. 33, ¶ 11]; *see supra* note 2.

6.       In conjunction with the Briscoe Acquisition, the Debtor entered into a stockholders agreement with Rubicon, Crestview, Chandler, and McCormick (the Stockholders Agreement). Pursuant to the terms of the Stockholders Agreement, the Debtor was precluded from undertaking certain actions without the consent of all parties to the Stockholders Agreement, including, *inter alia*, incurring certain levels of debt and selling substantially all of the Debtor's assets. The Stockholders Agreement also provided that so long as Rubicon held twenty percent (20%) of the Debtor's common stock, Rubicon would have authority to appoint two (2) members to the Debtor's board of directors. [Docket No. 33, ¶ 12]; *see supra* note 2.

7.       As preferred shareholders, Rubicon and Crestview were entitled to vote with common shareholders. [Testimony of the Trustee: Mar. 10 & 18, 2009.]

8.       Paragraph 1(C) of the Stockholders Agreement states that:

> All of the parties hereto agree that the Company will not take any of the following actions without the prior written consent of (i) each Management Investor or Institutional Investor Owning [sic] at least ten percent (10%) of the Common Stock (including any Securities convertible into Common Stock), and (ii) William M. Chandler, Jr. and Lester C. McCormick (or their respective Permitted Transferees) so long as either of them (or their respective designees) is a member of the Board of Directors of the Company or they and their Permitted Transferees collectively Own at least five percent (5%) of the Common Stock (including any Securities convertible or exercisable into Common Stock): (1) any amendment to or filing of the Certificate of Incorporation, bylaws or any certificate of designations of any preferred stock of the Company if such filing or amendment materially adversely effects any such Person, (2) the issuance of any Securities of the Company, or (3) any merger or consolidation involving the Company, the sale of all or substantially all of the assets of the Company (whether in one or a series of transactions), or any similar transaction.

[Trustee's Ex. No. 8: Stockholders Agreement, p. 2.]

4

9.    On December 6, 2005, the Debtor's current shareholders approved a resolution to issue

additional shares of stock, and this was signed, *inter alia*, by H. Joseph Leitch (Leitch), in

his capacity as a partner at Rubicon. [Trustee's Ex. No. 10: Written Consent of the

Stockholders of Red River Energy, Inc. in Lieu of Meeting, p. 3.]   On December 14, 2005,

the Debtor sold an additional 14,884 shares of preferred stock to Rubicon, Crestview, Nathan

A. Low (Low), CCM Master Qualified Fund, LTD. (CCM), TOIBB Investment LLC (TOIBB

LLC), and Michael Toibb (Toibb and together with Rubicon, Crestview, Low, CCM, and

Toibb LLC, the Investor Group) for a total of $4,000,000.00.   As a result of this transaction,

the ownership of the Debtor's stock was as follows:

| Shareholder | Number of Shares[4] | Percentage of Shares[5] |
|---|---|---|
| Rubicon | 53,023 | 45.0% |
| Crestview | 29,767 | 25.3% |
| Low | 1,860 | 1.6% |
| CCM | 5,581 | 4.7% |
| TOIBB LLC | 4,465 | 3.8% |
| Toibb | 186 | 0.2% |
| Chandler | 11,500 | 9.8% |
| McCormick | 11,500 | 9.8% |

---

[4]All members of the Investor Group held preferred stock, which was at all times fully convertible to shares of common stock (the initial conversion rate was 1:1, and was subject to adjustment). Thus, because Rubicon held 53,023 preferred shares, Rubicon could convert these preferred shares into 53,023 common shares. That Chandler and McCormick, at all times, held shares of common stock does not affect their percentage ownership of the Debtor because regardless of whether Rubicon held preferred shares or common shares converted from preferred shares, the percentages did not change because the conversion rate was 1:1.

[5]These percentages are based upon the number of shares of both preferred and common stock outstanding as of December 14, 2005. Additionally, the percentage shares have been rounded to the nearest tenth of a percent.

5

[Docket No. 33, ¶ 13]; *see* supra note 2.

10.    Subsequent to the Briscoe Acquisition, the Debtor commenced operations as a drilling company at a time when Chandler (as Chairman of the Board and CEO) and McCormick (as President and Secretary) were the two officers of the company.  The Debtor aggressively pursued its growth plan by investigating the acquisition of other drilling companies and the purchase of additional drilling rigs. [Docket No. 33, ¶ 14]; *see supra* note 2.

11.    In early 2006, the Debtor identified an opportunity to expand its drilling capabilities and contracted with C&L Services, LP for the construction of a drilling rig (the C&L Rig).  On March 31, 2006, the Debtor obtained financing for the purchase of the C&L Rig in the form of an $8 million dollar bridge loan (the Bridge Loan).  On April 1, 2006, the Debtor closed on its purchase of the C&L Rig. [Docket No. 33, ¶ 15]; *see supra* note 2.

12.    The Bridge Loan documents reveal that Rubicon was one of the lenders that funded the Bridge Loan and also acted as the agent for the lender group.  The Bridge Loan was purportedly secured by a second lien on substantially all of the Debtor's assets. [Docket No. 33, ¶ 16]; *see supra* note 2.

13.    In the first quarter of 2006, certain preferred shareholders began to question the Debtor's financial performance as well as the management abilities of Chandler and McCormick.  In May of 2006, certain preferred shareholders voted, pursuant to the terms of the Stockholders Agreement, to place two (2) additional members, Kenneth Scott (Scott) and Scott H. Filstrup (Filstrup), on the Debtor's board of directors.  In July of 2006, the preferred shareholders appointed another member to the Debtor's board of directors, Ed Hendrix (Hendrix).  Hendrix was then appointed as the Chairman of the Debtor's board of directors.  Throughout the

6

remainder of 2006, the Debtor experienced financial difficulties. [Docket No. 33, ¶ 17]; *see supra* note 2.

14.    Filstrup is an energy advisor to, and a member of, Crestview. [Testimony of the Trustee: Mar. 10 & 18, 2009; Testimony of Burns: May 27, 2009.]

15.    On May 2, 2006, Anne Newman, a certified public accountant for Associated Resources, Inc., a company which prepared financial data for the Debtor, noted in an email that she sent company financials and rig reports to Chandler and McCormick prior to sending them to Rubicon and Crestview. [Resp. Ex. No. 1: Email from Anne Newman to Chandler and McCormick.]

16.    On June 12, 2006, Tiger Craft (Craft), an analyst with Rubicon, sent an email alerting Dan LeRoy, an attorney, of Rubicon's intent to appoint an additional board member to serve as chairman of the Debtor's board.  In addition, Craft noted he would like to "re-draft the shareholder resolution to appoint all three board members." Stewart Flink (Flink), a managing member of Crestview, was copied on this email. [Trustee's Ex. No. 17: Email from Tiger Craft to Dan Leroy.]

17.    On June 18, 2006, Craft discussed Hendrix's first priority as Chairman. This email was sent to Flink and the other board members. [Trustee's Ex. No. 18: Email from Tiger Craft.]

18.    On June 22, 2006, Craft informed Todd Cook, a person who apparently worked at Crestview, that cash, which Rubicon was controlling, was released from escrow so that Rubicon could "obtain leverage with management over certain board members." [Trustee's Ex. No. 37: Email from Tiger Craft to Todd Cook.]

19.    On September 1, 2006, Chandler informed Charlee Hancock (Hancock), the Chief Financial

Officer at Associated Resources, Inc. not to distribute financials until either Chandler or McCormick reviewed them. [Resp. Ex. No. 2: Email from William Chandler to Charlee Hancock.]

20.   In December of 2006, the Debtor was experiencing serious cash flow problems and was in dire need of additional capital.  When the Debtor—i.e., Chandler, in his capacity as as Chairman of the Board and CEO—approached the Investor Group regarding the Debtor's need for additional funding, Rubicon and Crestview explained that in order for the Debtor to obtain additional capital, McCormick and Chandler would have to resign both their management and board positions. [Docket No. 33, ¶ 18]; *see supra* note 2.

21.   On December 6, 2006, Rubicon notified Chandler that if McCormick and Chandler resigned, Rubicon and Crestview would commit $3.5 million to the Debtor as part of a rescue funding package.  Rubicon subsequently negotiated Chandler and McCormick's severance packages. [Trustee's Ex. 20: Email from Tiger Craft to William Chandler.]

22.   On January 20, 2007, John Schmit (Schmit) of Crestview e-mailed Chandler and McCormick to set up a teleconference to discuss the Debtor's current situation and to "reach a resolution of the settlement issue."  Craft and Flink were copied on this email. [Trustee's Ex. No. 21: Email from John Schmit to William Chandler and Les McCormick.]

23.   On January 22, 2007, McCormick and Chandler consented to Rubicon and Crestview's demands and entered into a settlement and release with the Debtor.  At this time, McCormick and Chandler signed a General Release Agreement (General Release Agreement), which Leitch also signed on behalf of Rubicon. [Trustee's Ex. Nos. 23 and 24: General Release Agreement, p. 5.]  Additionally, on January 22, 2007, Gary Burns (Burns) was installed as the Chief

Restructuring Officer (CRO) of the Debtor. [Trustee's Ex. No. 5, Unanimous Written Consent of the Board of Directors of Red River Energy, Inc.] From that time until May of 2008, Burns was CRO of the Debtor, having been appointed by the Debtor's board of directors (i.e. Hendrix, Scott, and Filstrup). All three board members were appointed and controlled by Rubicon and Crestview. [Docket No. 33, ¶ 19; Testimony of Burns: May 27, 2009]; *see supra* note 2.

24.     In the agreement dated January 22, 2007, among McCormick, Chandler, and the Debtor's shareholders detailing McCormick and Chandler's resignations and the future structure of the Debtor (Settlement Agreement), the Stockholders Agreement was altered to delete paragraph 1(C). This alteration expanded Rubicon and Crestview's power to allow them to appoint all three members of the Board of Directors.[6] Leitch also signed this Agreement. [Trustee's Ex. No. 27: Settlement Agreement.]

25.     On January 23, 2007, the Debtor was provided additional funding in the form of a $3 million term note funded by Rubicon and Crestview (the Term Note), which was apparently used to cover operational expenses for the remainder of 2007 and the first half of 2008. The Term Note was also purportedly secured by a lien on substantially all of the Debtor's assets. [Docket No. 33, ¶ 20]; *see supra* note 2.

26.     According to the Term Note, Rubicon and Crestview assessed a fee to the borrower, the Debtor, which designated a non-refundable fully earned commitment fee equal to three percent

---

[6] Under the Settlement Agreement, this particular power is granted to "Institutional Investors Owning a majority of the Common Stock . . . Owned by all Institutional Investors." [Trustee's Ex. No. 27: Settlement Agreement.] In the Stockholders Agreement, "Institutional Investors" is defined as Rubicon and Crestview. [Trustee's Ex. 8: Stockholders Agreement.]

of the principal amount of the first tranche.  Additionally, an overdue payment fee, equal to three percent of the overdue payment, would be due if a payment was not received within fifteen days of the Maturity Date (as that term is defined in the Term Note). [Trustee's Ex. 28: Term Note.]

27.   As CRO of the Debtor, Burns signed the Term Note, but he had no say at all regarding the terms of this transaction.  Rubicon and Crestview dictated all of the terms and conditions of the Term Note, and Burns executed it on behalf of the Debtor without any negotiation or questioning. [Testimony of Burns: May 27, 2009.]

28.   Burns was first recommended to Rubicon and Crestview by Greenberg Traurig, L.L.P. (Greenberg Traurig). [Testimony of Burns: May 27, 2009.]

29.   Burns was employed by Walker Nell Consultants, Inc. (WNC) until July 4, 2007, and then was employed at Stout Risius Ross, Inc. (SRR).  Both companies contracted with the Debtor to provide Burns' services as CRO.  In May of 2008, however, SRR terminated his employment and therefore Burns' tenure as CRO of the Debtor came to an end. [Testimony of Burns: May 27, 2009.]

30.   SRR is a financial advisory services firm headquartered in Michigan with offices in Chicago. [Docket No. 47; Crestview/Rubicon Ex. No. 1: Red River Contacts.]

31.   Burns took directions from the members of the Debtor's board, all three of whom became directors at the insistence of Rubicon and Crestview. [Testimony of Burns: May 27, 2009.]

32.   During virtually the entire time of Burns' tenure as CRO—i.e. from January 2007 until his resignation in May of 2008—the Debtor had no employees, officers, or significant operations. Burns was there solely to obtain a buyer for the Debtor's assets. [Testimony of Burns: May 27,

2009.]

33.    Rubicon and Crestview, in addition to Burns, were sent all emails which were designated as having a "red flag" status. [Crestview Ex. No. 30: Email from Alma Gilo of Walker Nell Consultants to the Board of Directors, Crestview, and Rubicon; Testimony of Burns: May 27, 2009.]

34.    On February 1, 2007, Alma Gilo emailed Crestview, Rubicon, and the members of the the Debtor's Board a "revised budget" and "action plan." [Crestview/Rubicon Ex. No. 31: Email from Alma Gilo of Walker Nell Consultants to the Board of Directors, Rubicon, and Crestview.]

35.    An email from July of 2007, states that Rubicon and Crestview must approve changes in management. [Crestview/Rubicon Ex. No. 40: Email from Steve Heinen to the Board of Directors, Rubicon, and Crestview.]

36.    On November 1, 2007, Bob Martinez, an analyst at SRR, emailed a "board package" to the current Board of the Debtor, Rubicon, Crestview, Flink, and Leitch; additionally, Martinez copied Burns on the email. [Crestview/Rubicon Ex. No. 40: Email from Bob Martinez to the Board of Directors, Rubicon, and Crestview.]

37.    From approximately November 1, 2007 through February 18, 2008, there was relatively little activity at the Debtor, and the activities of Burns, even though he was officially the CRO of the company, were nominal. [Testimony of Burns: May 27, 2009.]

38.    Hendrix, Scott, and Filstrup, in their respective capacities as directors of the Debtor's board, passed board resolutions on February 18 and March 5, 2008.  The most significant resolution directed Burns to seek to sell the Debtor's assets.  Burns attempted to carry out this objective.

[Crestview/Rubicon Ex. Nos. 43 & 44: Memorandum of Unanimous Consent, February 18, 2008, paragraph 3; Testimony of Burns: May 27, 2009.]

39.   The March 5, 2008 resolution resolved that "the proceeds of the sale(s) remaining after satisfaction of the costs of the sale(s) shall be paid to the creditors holding security interests in or liens on the portions of the Property that were sold in the order and in the amounts required by law and the Corporation's contractual obligations." [Crestview/Rubicon's Ex. No. 44: Memorandum of Unanimous Consent.]

40.   On March 6, 2008, the Debtor's three board members resigned.  [Trustee's Ex. Nos. 34-36: Letters from Filstrup, Hendrix, and Scott to Gary Burns; Testimony of Burns: May 27, 2009.]

41.   In May of 2008, Burns resigned as the CRO of the Debtor. [Docket No. 47; Testimony of Burns: May 27, 2009.]

42.   Burns thereafter briefly rescinded his resignation in that same month for a very specific purpose: to sign a power of attorney authorizing Michael L. Kern, III (Kern)—the President at SRR—to perform various acts for the Debtor, including executing the documents that memorialized the sale in June of 2008 of virtually all of the Debtor's assets to Great American Group (GAG). [Docket No. 47; Docket No. 33; Testimony of Burns: May 27, 2009]; *see supra* note 2.

43.   Keith Shapiro is a partner in the Chicago office of Greenberg Traurig, and Greenberg Traurig has been representing Rubicon and Crestview for several years. [Testimony of Burns: May 27, 2009.]

44.   In late 2007, Shapiro urged Rubicon and Crestview to have the Debtor retain Burns as a CRO. [Testimony of Burns: May 27, 2009.]

45. The sale of the Debtor's assets to GAG in June of 2008 was for a total cash amount of $13.15 million. [Docket No. 33; Testimony of Burns: May 27, 2009]; *see supra* note 2.

46. While the purchase price was for $13.15 million, an appraisal of the Debtor's assets in May of 2006—i.e., approximately two years prior to the sale—valued these assets at $44.0 million. Thus, the difference between this appraised value and the actual sales price was approximately $31.0 million. [Docket No. 33; Testimony of Burns: May 27, 2009]; *see supra* note 2.

47. At the time GAG purchased the Debtor's assets, GAG issued a press release to the effect that it had just purchased assets having a value of approximately $50 million. [Docket No. 33; Testimony of Burns: May 27, 2009]; *see supra* note 2.

48. After the sale, the Debtor remitted $273,777.86 from the sale proceeds to Greenberg Traurig. This law firm was not a secured creditor of the Debtor, but rather an unsecured creditor. [Crestview/Rubicon Ex. 42: Statement of Financial Affairs.]

49. On September 12, 2008, certain of the Debtor's unsecured creditors (i.e. C & L Services, L.P.; Tommy's Machine Works, Inc.; Rifle Hospitality, L.L.C.; and Jeffrey Davis) filed an involuntary Chapter 7 petition against the Debtor. [Docket No. 1.]

50. On January 13, 2009, this Court entered an order for relief. [Docket No. 20.]

51. On January 14, 2009, Ben B. Floyd (the Trustee) was appointed to serve as the Chapter 7 Trustee for this case. [Docket No. 47.]

52. On March 9, 2009, the Trustee filed a pleading entitled "Motion to Designate Crestview Capital Master, LLC and Rubicon Master Fund as the Entities Responsible to Discharge Duties of the Debtor Under Federal Rule of Bankruptcy Procedure 9001(5)" (the Motion). [Docket No. 33]; *see supra* note 2.

53. On March 17, 2009, Rubicon and Crestview filed their Objection to the Motion (the Objection). [Docket No. 47.]

54. At some point between March 17, 2009 and May 25, 2009, Rubicon and Crestview retained and paid Burns to prepare proposed Schedules and Statement of Financial Affairs for the Debtor. [Testimony of Burns: May 27, 2009.] Rubicon and Crestview then introduced these two documents into evidence at the hearing on the Motion held in this Court on May 27, 2009 in support of their position that Burns, as the former CRO of the Debtor, and not Crestview or Rubicon, should be designated as the Debtor's representative for this case. [Crestview/Rubicon Ex.. Nos. 41 and 42.]

55. Burns signed the proposed Schedules and Statement of Financial Affairs as the "former Chief Restructuring Officer" of the Debtor. [Crestview/Rubicon Ex. No. 42: Statement of Financial Affairs.]

56. According to proposed Schedule F completed by Burns, the Debtor has total unsecured debts of approximately $2.4 million. [Crestview/Rubicon Ex. No. 41: Schedule F.]

57. According to the proposed Schedules completed by Burns, as of the date of the filing of the petition, the Debtor had no assets whatsoever. [Crestview/Rubicon Ex. No. 41: Schedules A, B, & C.]

58. According to the proposed Statement of Financial Affairs completed by Burns, the Debtor made the following payments to the following individuals or entities in May and June of 2008, and two years prior to the filing of the bankruptcy petition, respectively:

**Payments Made to Insiders Within One Year Preceding the Commencement of this Case**

| | | |
|---|---|---|
| Crestview Capital Master, LLC | May 2008 | $1,341,817.42 |
| Rubicon Master Fund | May 2008 | $1,341,817.42 |
| Crestview Capital Master, LLC | June 2008 | $593,584.50 |
| Rubicon Master Fund | June 2008 | $593,594.50[7] |

**All Property Transferred (Outside the Ordinary Course of Business) Within Two Years Preceding the Commencement of this Case**

| | | |
|---|---|---|
| Rubicon Master Fund | January 2007 | Security Interest |
| Crestview Capital Master | January 2007 | Security Interest |
| CCM Master Qualified Fund Ltd. | November 2007 | Security Interest |
| Rubicon Master Fund | November 2007 | Security Interest |
| Crestview Capital Master, LLC | November 2007 | Security Interest |
| Briscoe Drilling Corporation | May 2008 | $6,163,915.85 |
| Palmer Oil Field Services | May 2008 | $16,486.02 |
| I.E. Miller Services | May 2008 | $15,000.00 |
| Canary Resources, Inc. | May 2008 | $18,264.41 |
| Gator Manufacturing | May 2008 | $14,611.67 |
| Al's Rig Services, LLC | May 2008 | $100,000.00 |
| Rick's Rig Services, LLC | May 2008 | $18,997.77 |
| T&G Auto and Diesel Repair | May 2008 | $24,000.00 |

---

[7] It appears that one immaterial typographical error has been made in Burns's proposed Statement of Financial Affairs. The amount of $593,594.50, which was listed as a payment to Rubicon in June of 2008, and characterized as a payment made to an insider within one year, is ten dollars more than the figure of $593,584.50 listed as a transfer of property to Rubicon made within two years prior to the filing of the bankruptcy petition. These charts reflect this *de minimus* error.

| Speedy Heavy Hauling, Inc. | May 2008 | $2,700.48 |
|---|---|---|
| Greenberg Traurig, LLP | May 2008 | $273,777.86 |
| GableGotwals | May 2008 | $70,000.00 |
| Stout Risius Ross, Inc. | May 2008 | $9,237.16 |
| Travis Wolff & Company, LLP | May 2008 | $12,000.00 |
| Crestview Capital Master, LLC | May 2008 | $1,341,817.42 |
| Rubicon Master Fund | May 2008 | $1,341,817.42 |
| CCM Master Qualified Fund, Ltd. | May 2008 | $1,584,543.94 |
| Stout Risius Ross, Inc. | June 2008 | $40,530.00 |
| CCM Master Qualified Fund Ltd. | June 2008 | $712,301.00 |
| Rubicon Master Fund | June 2008 | $593,584.50 |
| Crestview Capital Master, LLC | June 2008 | $593,584.50 |

[Crestview/Rubicon Ex. 42: Proposed Statement of Financial Affairs.]

59.     Burns conceded on cross-examination that he does not have personal knowledge or the documents memorializing the sale and distribution of payments that the proposed Statement of Financial Affairs represents the Debtor made in May and June of 2008. [Testimony of Burns: May 27, 2009.]

60.     The sum of payments made to insiders within one year of the petition date, according to the proposed Statement of Financial Affairs completed by Burns, is approximately $3,870,802.00. [Crestview/Rubicon Ex. 42: Statement of Financial Affairs.]

61.     The sum of property transferred outside the ordinary course of the Debtor's business within two years of the petition date, according to the proposed Statement of Financial Affairs completed by Burns, is approximately $12,947,170.00. [Crestview/Rubicon Ex. 42: Statement of Financial Affairs.]

16

### III. Credibility of Witnesses

At the hearing on the Motion, two witnesses testified: the Trustee and Burns.  The Court finds that both witnesses were credible.

### IV. Conclusions of Law

**A.    Jurisdiction and Venue**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).  Additionally, this proceeding is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1408(1).

**B.    Federal Rule of Bankruptcy Procedure 9001(5) expressly authorizes the appointment of a controlling shareholder.**

Federal Rule of Bankruptcy Procedure 9001(5) (Bankruptcy Rule 9001(5)) states that:

> "When any act is required by these rules to be performed by a debtor or when it is necessary to compel attendance of a debtor for examination and the debtor is not a natural person: (A) if the debtor is a corporation, 'debtor' includes, if designated by the court, any or all of its officers, members of its board of directors or trustees or of a similar controlling body, a *controlling stockholder* or member, or any other person in control . . . "

Fed. R. Bankr. P. 9001(5) (emphasis added).

The Supreme Court has held that the "plain language" and "express terms" of the Bankruptcy Code (the Code) will dispose of questions regarding the application of the Code. *Toibb v. Radloff*, 501 U.S. 157, 160-61 (1991). This holding also applies to the Federal Rules of Bankruptcy Procedure. *See In re Thomas*, 203 B.R. 64, 67 (Bankr. E.D. Tex. 1996) (applying plain meaning doctrine to bankruptcy rules) (citing *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643-44 (1992)). Under the plain meaning of Bankruptcy Rule 9001(5), a "controlling stockholder" may be designated by the Court.

In the case at bar, Rubicon is unquestionably a controlling shareholder; it owns the most stock of any shareholder, [Finding of Fact No. 9.], and its percentage ownership (45%) constitutes control. *See, e.g., Riggs Nat. Bank of Wash. D.C. v. Allbritton*, 516 F. Supp. 164, 179 (D.D.C. 1981) (holding that ownership of thirty-five percent of total outstanding shares of a stock constitutes effective control); 15 U.S.C. § 80a-2(a)(9) (presuming control by "any person who owns . . . more than 25 per centum of the voting securities of a company"). Burns, on the other hand, has never owned any shares of the Debtor's stock, and therefore could not possibly be a controlling shareholder. Accordingly, because Rubicon is a "controlling shareholder," under the plain meaning of Bankruptcy Rule 9001(5), this Court may appoint Rubicon as the representative of the Debtor, but it may not appoint Burns.[8]

Rubicon and Crestview contend that Bankruptcy Rule 9001(5) only allows the Court to appoint individuals, not corporations, as a representative of the Debtor. Specifically, Rubicon and Crestview point to the phrase in Bankruptcy Rule 9001(5) "or any other person in control" to support its contention that this Court may appoint only an individual, and not a corporation, as the Debtor's

---

[8]This Court also finds that Crestview is a controlling shareholder. However, for reasons discussed later in this Memorandum Opinion, the Court concludes that it may designate only one of these corporations to be the Debtor's representative under Bankruptcy Rule 9001(5). This Court has decided to designate Rubicon for the reasons discussed *infra*, Part V.

representative.  This Court disagrees.  Under the Code, the definition of "person" includes "individual, partnership, and corporation."  11 U.S.C. § 101(41).  Therefore, the phrase "any other person in control" can mean any other "individual" in control, or any other "partnership" in control, or any other "corporation" in control.[9]

Indeed, it is generally accepted that corporations, as well as individuals, may hold stock in another corporation. *See generally, e.g.*, Tex. Bus. Orgs. Code Ann. § 2.101; Del. Code Ann. tit. 8, § 123; N.Y. Bus. Corp. Law § 202(a)(6).  Here, Rubicon—a company incorporated under the laws of the Cayman Islands [Finding of Fact No. 2.]—acquired shares in the Debtor, which is incorporated under the laws of Delaware. [Finding of Fact Nos. 1 & 4.]  While Delaware courts have consistently held that Delaware corporations may be shareholders,[10] there is scant authority to suggest that a company incorporated in the Cayman Islands may hold stock in a Delaware company.  Despite this lack of authority, the Honorable Marvin P. Isgur, another Bankruptcy Judge sitting in the Bankruptcy Court for the Southern District of Texas, recently acknowledged that a company incorporated in the Cayman Islands may be a stockholder in a Delaware corporation.  *See In re Interamericas, Ltd.*, 321 B.R. 830, 832 (Bankr. S.D. Tex. 2005) (acknowledging that a company incorporated in the Cayman Islands held stock in a Delaware corporation).  Therefore, the plain meaning of Bankruptcy Rule 9001(5) authorizes this Court to designate Rubicon, as a controlling shareholder of the Debtor, to serve as the Debtor's representative in this case.

---

[9] Hereafter, the use of the word "person" or "persons" (when expressly in quotations) means that this Court is using this word as it is defined in 11 U.S.C. § 101(41).

[10] *See, e.g.*, *Leibert v. Grinnell Corp.*, 194 A.2d 846, 850 (Del. Ch. 1963) (holding that "[s]ecurities of other corporations may, of course, be acquired by a Delaware corporation").

**C.     The date of filing of the bankruptcy petition controls.**

In determining whom to appoint as the Debtor's representative, this Court also believes that any "persons" who fall into any of the categories set forth in Bankruptcy Rule 9001(5) must have ties to the Debtor at the time of the filing of the bankruptcy petition.

The Bankruptcy Code and Rules specify that, in several instances, the date of filing is determinative for various issues.  For example, Official Bankruptcy Form 6 requires a debtor to list secured and unsecured claims "as of the date of filing of the petition" and Federal Rule of Bankruptcy Procedure 1007 requires debtors to file documents "as prescribed by the Official Forms." Additionally, 11 U.S.C. § 541 explicitly states that the commencement of an involuntary bankruptcy case creates an estate which is comprised of property "as of the commencement of the case." 11 U.S.C. § 541.  The Fifth Circuit has held that "as of the commencement of the case" means the petition filing date. *In re Burgess*, 438 F.3d 493, 496 (5th Cir. 2006).

The Fifth Circuit has highlighted the importance of the filing date when it determined that a homestead exemption must be determined at the "date of filing of the original petition," rather than the date of conversion from a Chapter 13 to a Chapter 7. *Lowe v. Sandoval (In re Sandoval)*, 103 F.3d 20, 21 (5th Cir. 1997).  The Fifth Circuit emphasized the filing date's importance by holding that "income acquired after the original filing of the Chapter 13 petition and before conversion is not part of the converted estate." *In re Stamm,* 222 F.3d 216, 217 (5th Cir. 2000).  Further, the Fifth Circuit has held that post-petition crop-disaster-relief payments, even though based on pre-petition crop losses, were not to be considered part of the bankruptcy estate, because, among other reasons, the "critical time remains the date of filing." *In re Burgess,* 438 F.3d at 500.

In this case, the filing date is September 12, 2008.  On September 12, 2008, the Debtor had no

officers, board members, trustees, controlling bodies, or "other person in control." [Finding of Fact Nos. 32, 40, & 41.] The only existing "persons" within the universe of Bankruptcy Rule 9001(5)'s laundry list of potential designees were the Debtor's controlling shareholders—Rubicon and Crestview—and therefore one of these entities must be designated to perform the Debtor's duties in this case.

The former Chief Restructuring Officer—Burns—may not be designated by the Court to handle the Debtor's duties. As of the filing of the Debtor's involuntary petition, Burns held no position whatsoever with the Debtor that falls within Bankruptcy Rule 9001(5)'s laundry list of "persons" who may serve as the Debtor's representative. [Finding of Fact No. 23.] As of September 12, 2008, Burns was neither an officer, a director, a trustee, a controlling body, a controlling shareholder, nor a person in control. [Finding of Fact No. 41.] Indeed, he resigned as Chief Restructuring Officer of the Debtor in May of 2008, [Finding of Fact No. 41], four months prior to the filing date. Accordingly, because this Court concludes that Bankruptcy Rule 9001(5)'s laundry list encompasses only those "persons" with ties to the Debtor as of the filing date, Burns may not be designated as the Debtor's representative.

**D.**    **In the alternative, even if this Court is incorrect about the need to focus on the "persons" with ties to the Debtor on the petition date and Bankruptcy Rule 9001(5) instead allows appointment of a "person" without ties to the Debtor on the petition date, the Court would still designate Rubicon or Crestview over Burns.**

1.    **Burns, the former CRO of the Debtor, may not serve as the Debtor's representative, given that his resignation was in no way related to the bankruptcy petition and his testimony is not necessary to the bankruptcy case.**

Even if this Court is incorrect that Bankruptcy Rule 9001(5)'s laundry list of potential "persons" who may act as the Debtor's representative must be viewed as of the petition date, the Court

would still not appoint Burns. The Second Circuit was willing to designate a former officer—i.e. an individual who departed prior to the petition date—as the debtor's representative, but only where the officer parted ways with the company two weeks prior to the filing of the case in order to evade the bankruptcy proceedings. *Greene v. Harris*, 240 F.2d 275, 275 (2d Cir. 1957). In addition, at least one court has held that there must be some belief that the former officer's testimony is necessary to the bankruptcy proceedings. *In re Bell Refrigeration Corp.*, 169 F. Supp. 62, 64 (D.C. Ohio 1958).

In the present case, Burns resigned four months prior to the filing date, [Finding of Fact No. 41], and there is no evidence that he departed with the intent to evade involvement with the Debtor's Chapter 7 case. Indeed, he could not have possibly known that there would be an involuntary petition filed four months after he resigned. Finally, as discussed below, Burns's testimony is not necessary to the Debtor's bankruptcy case, given Rubicon and Crestview's superior knowledge and control of the Debtor.

### 2.   Rubicon and Crestview must be deemed in control due to their knowledge of the Debtor's history in general, and the key affairs in particular, that occurred within days prior to the filing of the petition.

Rubicon and Crestview argue that Bankruptcy Rule 9001(5) requires the appointment of someone who is very knowledgeable about the Debtor's daily affairs, particularly the affairs and events that occurred prior to the filing of the petition. Indeed, that is why they insist that Burns is the only one qualified to be the Debtors's designated representative. They contend that Burns has much more knowledge than either of them.

Bankruptcy Rule 9001(5), however, contains no such "knowledge" requirement. Indeed, if anything, Bankruptcy Rule 9001(5) impliedly recognizes that the appointed representative might *not* have substantial knowledge about the debtor's affairs. After all, there are numerous directors on

boards throughout this country who are not well versed in the daily activities of the entity on whose board they sit. *See, e.g., Church Point Wholesale Beverage Co., Inc. v. Voitier*, 706 So. 2d 1015, 1020 (La. Ct. App. 1998) (noting that two members of the board of directors "knew little or nothing about the operation of the company"). That Bankruptcy Rule 9001(5) ought to require an appointed representative to have substantive knowledge may well have merit. However, even though "[f]elicity to statutory demands may produce outcomes that are burdensome to process and contrary to judicial expediency" the remedy "lies with the legislature, not the courts." *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 31 (S.D. Tex. 1992).[11] Accordingly, in the case at bar, even if Rubicon does not have extensive knowledge of the Debtor's affairs—and this Court believes that Rubicon does have substantial knowledge—Bankruptcy Rule 9001(5) nevertheless authorizes this Court to designate Rubicon as the Debtor's representative.

Indeed, this Court finds that Rubicon and Crestview have knowledge superior to all other potential designees, including Burns (assuming arguendo that Burns could be designated). While the standard for requisite knowledge by a shareholder to serve as a debtor's representative is unsettled by the Fifth Circuit, *In re Muy Bueno Corp.* looked to the extent of a party's knowledge compared to all other potential parties. 257 B.R. 843 (Bankr. W.D. Tex. 2001). In that case, the court held that an individual who had worked for the corporation briefly in the 1980s had only "little or no knowledge," and therefore could not serve as the debtor's representative in the Chapter 7 bankruptcy filed in 2000. *Id.* at 846. Further, that court explained that it needed to appoint "the person most likely to be knowledgeable." *Id.* at 847–48. This opinion indicates that a "person" must have "actual knowledge"

---

[11] The District Court also noted that, "[i]f a statute speaks with clarity to an issue, judicial inquiry is complete." *In re Schepps Food Stores, Inc.*, 148 B.R. at 30. As previously noted, this Court similarly believes that in the present case, Bankruptcy Rule 9001(5) is clear as to the power to appoint a controlling shareholder to fulfill the debtor's duties.

of the debtor's recent affairs to become a debtor's representative. *Id.* at 846. However, the facts in that case involved an individual clearly lacking adequate knowledge, as opposed to individuals with arguably sufficient knowledge. *Id.* Consequently, *In re Muy Bueno Corp.* does not address the situation in the case at bar where—assuming Burns had sufficient knowledge to act as the Debtor's representative—there are three "persons" with extensive knowledge of the Debtor's affairs.

Rubicon and Crestview contend that Burns is more knowledgeable about the Debtor's affairs than either of them. This Court disagrees. Rubicon and Crestview's knowledge is superior in four respects. First, Rubicon performed duties beyond those normally performed by shareholders, including serving as an agent for the Bridge Loan, redrafting the shareholder resolution, creating goals and priorities for the Chairman of the Board, and negotiating settlements with employees. [Finding of Fact Nos. 12, 16, 17, 21, & 22.] This broad control was coupled with these entities' minute supervision of e-mails, budget revisions, and changes in management. [Finding of Fact Nos. 33 & 34.] Rubicon and Crestview's nearly constant access to the Debtor's ongoing operations indicates that these entities have extensive knowledge of the Debtor's affairs.

Second, as a corollary to Rubicon and Crestview's superior knowledge of the Debtor's affairs, they undeniably had unique insight into the Debtor's operations, as evidenced by their demand that McCormick and Chandler step down. [Finding of Fact Nos. 20 & 21.] When the Debtor began experiencing financial difficulties, Rubicon and Crestview offered a loan to fund the Debtor's continued operations. [Finding of Fact Nos. 20 & 21.] However, Rubicon and Crestview conditioned this further investment on the resignation of McCormick and Chandler. [Finding of Fact No. 21.] Because these two shareholders were adamant that McCormick and Chandler step down, they must have had a sound basis for their belief that McCormick's and Chandler's performance was lacking and

24

that there was another individual or individuals better able to serve. This belief necessarily shows—or at least strongly implies—that Rubicon and Chandler had detailed knowledge of the Debtor's operations when those entities required McCormick and Chandler to resign.

Third, the extensive time period during which Rubicon and Crestview were involved with the Debtor indicates that these entities have superior knowledge about the Debtor's affairs. Rubicon was an initial shareholder and member of the Debtor, and approximately one month later, Crestview acquired stock in the Debtor. [Finding of Fact Nos. 1 & 4.] Therefore, these two parties were involved with the Debtor from its origin and have significantly more experience with the company than Burns. Indeed, Rubicon and Crestview played a role in forming and carrying out the purposes and goals behind the formation of the Debtor. [Finding of Fact Nos. 3 & 6.] There is no one else in existence that has maintained such a long running relationship with the Debtor, as McCormick and Chandler left the company in January 2007, [Finding of Fact No. 23.], and, after their departure, Burns was involved with the Debtor for approximately seventeen months. [Finding of Fact Nos. 23 & 41.] Indeed, during Burns's tenure, the Debtor had no employees and was in the process of winding down and bringing its operations to a close. [Finding of Fact Nos. 32 & 37.]

Rubicon and Crestview argue that they lack the necessary knowledge about the Debtor. [Resp. Brief 12.] However, their brief concedes that the individual named as the Debtor's representative must be able to "respond to creditor inquiries." [Resp. Brief 12.] By their own admission, the most knowledgeable designee should be named by the Court to fulfill the Debtor's duties. As discussed above, of all the individuals or entities that have been involved in the Debtor's operations, Rubicon and Crestview have been involved with the Debtor for the longest period of time, and therefore have superior knowledge of the most salient facts which are necessary to respond to creditor inquiries.

Additionally, that Rubicon and Crestview are the principal shareholders of the Debtor and have exercised nearly total control over the Debtor for the last four years militate in favor of appointing one of these entities as the Debtor's designated representative.

Finally, Rubicon and Crestview also possess documents necessary to this bankruptcy case. Another court considered possession of documents and the importance of testimony to determine whether a particular individual should be appointed the debtor's representative, noting that, "[d]ocuments in his possession, custody, or control and his thorough examination ... are ... essential for the Debtor to be able to conduct this Chapter 11 case." *In re Continuum Care Servs.*, 375 B.R. 692, 694 (Bankr. S.D. Fla. 2007). Similarly, Rubicon and Crestview have both the knowledge and documents that are central to this case.

In the two years prior to filing, the Debtor distributed large amounts of money and property to various insiders and other entities outside of the ordinary course of business. [Finding of Fact No. 58.] The sum of payments made to insiders within one year of the petition date, according to the proposed Statement of Financial Affairs completed by Burns, is approximately $3,870,802.00, while the sum of transfers made outside the ordinary course of the Debtor's business within two years of the petition date, according to the proposed Statement of Financial Affairs completed by Burns, is approximately $12,947,170.00. [Finding of Fact Nos. 60, 61.] Because these sums are so substantial, it is imperative that the designee has extensive knowledge of these distributions in order to provide the Trustee with the necessary information for him to properly investigate these transfers.

Specifically, a portion of this money and property transferred was the result of the sale of substantially all of the Debtor's tangible assets for $13.15 million in June of 2008, even though the assets were valued at $44.0 million two years prior to the sale. [Finding of Fact No. 46.] The

difference between this appraised value and the actual sales price is approximately $31.0 million. [Finding of Fact No. 46.] Further, the purchaser of these assets, GAG, issued a press release to the effect that it had just purchased assets having a value of approximately $50.0 million. [Finding of Fact No. 47.] While it is possible that the Debtor's assets had decreased in value by this margin, it is imperative that this sale is investigated to determine whether the amount received for the Debtor's assets constitutes reasonably equivalent value.

Further, a substantial amount of the sale proceeds of $13.15 million were distributed to Rubicon and Crestview and, additionally, to their law firm, Greenberg Traurig. [Finding of Fact Nos. 48 & 58.] The proceeds of the sale were restricted as to their disbursement, and specifically earmarked for "secured creditors." [Finding of Fact No. 39.] Given the strict restrictions put on the distribution of monies from the Debtor to its creditors, an investigation is necessary to ascertain the justification behind the payments to Greenberg Traurig and other select unsecured creditors, and why other unsecured creditors—for example, the four unsecured creditors who filed the involuntary petition initiating this case, [Finding of Fact No. 49]—received no monies whatsoever.

By the time these distributions were made, Burns had already resigned, and the Debtor had no officers or directors. [Findings of Fact No. 40 & 41.] Burns conceded at the hearing that he does not have the documents memorializing the sale of the Debtor's assets or the distribution of the sale proceeds. [Finding of Fact No. 59.] Only Rubicon and Crestview have this written information, and it is of the utmost importance for the Trustee to fulfill his fiduciary obligations to creditors of the Debtor's estate by reviewing these documents and the sale transaction evidenced thereby. *See In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989) (noting that trustees have fiduciary duties); 11 U.S.C. § 704(4) (holding one of the trustee's duties is to "investigate the financial affairs

27

of the debtor"); *In re Graven*, 84 B.R. 630, 631 (Bankr. W.D. Mo. 1988) (directing a trustee to investigate pre-petition transfers to self-created corporations).   It is necessary that both the disbursement of the proceeds from the sale of the Debtor's assets and the parties who received distributions from the Debtor are reviewed and investigated, and that documents presently in the possession of Rubicon and Crestview are made available to the Trustee for this investigation. Because Rubicon and Crestview are the only parties that can provide this written information, because they have more extensive knowledge about the key aspects of the Debtor's affairs than does Burns[12]—or anyone else—and because they are the only parties presently controlling the Debtor, Rubicon and Crestview are the most qualified candidates to act as the Debtor's representative pursuant to Bankruptcy Rule 9001(5).

3.     **In addition to having substantial knowledge of, and control over, the Debtor due to their sole possession of the documents memorializing the June 2008 sale, their orchestration of the distribution of proceeds therefrom, and their majority interest in the Debtor, Rubicon and Crestview were in actual control of the Debtor by hand-picking the Debtor's board and officers long before the June 2008 sale.**

Rubicon and Crestview's control over the Debtor is evident from the influence they exerted over the company and its employees from its conception until the filing date, in addition to Rubicon and Crestview's manipulations of the Board of Directors.

According to the Bankruptcy Court for the Western District of Texas, the word "control" is intentionally undefined in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, in order to give each court a great deal of discretion in designating who should be in control. *In re Muy Bueno Corp.*, 257 B.R. at 847–48.  Because no standard exists for designating who should be in

---

[12] Indeed, Burns testified that he does not have personal knowledge about the distribution of the proceeds from the sale of the Debtor's assets in June of 2008.  [Finding of Fact No. 59.]

control, courts must look to the unique facts of each case in order to reach a conclusion as to who is

in control of the Debtor.  For example, a written document conveying control to a particular individual

as well as that individual's purported access to the premises were found to be insufficient to establish

"control" under Bankruptcy Rule 9001(5). *In re King Brand Food Prods., Inc.*, 52 B.R. 109, 110

(Bankr. S.D. Fla. 1985).  Conversely, an individual's actual "duties and responsibilities," based on the

unique facts of the case, was a significant factor for another court's determination of who was in

control. *In re Nw. Assocs., Inc.*, 245 B.R. 183, 186 (Bankr. E.D.N.Y. 1999).  Finally, another court

determined that the "creditor['s] . . . special relationship with the debtor" which included "compel[ing]

payment of its debt" was sufficient to support the court's conclusion that a creditor was in control of

the debtor. *In re F&S Cent. Manuf. Corp.*, 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985).  This latter

decision was also cited favorably by the Fifth Circuit in *In re Fabricators, Inc.*, 926 F.2d 1458, 1465-

66 (5th Cir. 1991).

　　　　While merely having the status of shareholder may be insufficient to support a conclusion that

a "person" is in control,[13] Rubicon and Crestview's actions went far beyond that of simply passive

shareholders.  First, Rubicon initially formed RR LLC, the predecessor to the Debtor, and held 80%

of the interest in that company. [Finding of Fact No. 1.]  One month later, Crestview joined the

venture. [Finding of Fact No. 4.] The original Stockholders Agreement authorized Rubicon to appoint

two members of the board, and barred the Debtor from amending the certificate of incorporation,

bylaws, issuances of securities, mergers, sales, or any "similar transaction" without approval. [Finding

of Fact Nos. 6 & 8.]   Rubicon not only elected a board member—Hendrix—pursuant to the

Stockholders Agreement, but also elevated him to the level of Chairman. [Finding of Fact No. 13.]

---

[13] *See In re Nixon Elec. Supply*, 85 B.R. 988, 989 (Bankr. W.D. Tex. 1988).

Rubicon then went on to dictate the new Chairman's priorities as Chairman of the Board of Directors for the Debtor. [Finding of Fact No. 17.]  Further, Rubicon and Crestview asserted control by overseeing changes in management. [Finding of Fact No. 35.]

At this time, Rubicon also began positioning itself for additional—and essentially virtual—control.  Rubicon and Crestview were not given complete control by Chandler and McCormick and were unhappy with that arrangement. [Finding of Fact Nos. 15 & 19.]  Rubicon planned to use its capital and loan to "obtain leverage" over the other Board members. [Finding of Fact Nos. 18 & 20.] Rubicon and Crestview denied additional capital (in the form of a loan) to the Debtor until McCormick and Chandler agreed to step down from the Debtor's Board of Directors.  Rubicon and Crestview were ultimately successful in leveraging the resignations they desired, after which Rubicon also negotiated their Settlement Agreement with the Debtor. [Finding of Fact Nos. 21 & 22.] This exercise of power exceeded that found in the Stockholders Agreement, which authorized only the election of board members, not their removal.

The Settlement Agreement also revised the original Stockholders Agreement, authorizing Rubicon and Crestview to appoint the entire Board of Directors, a far greater degree of control than the original Agreement permitted, which Rubicon intended to obtain well before it actually was able to do so. [Finding of Fact Nos. 16 & 24.] With this new control, Rubicon and Crestview then hand-selected a new Board of Directors, which then installed Burns as Chief Restructuring Officer. [Finding of Fact No. 23.] Burns's selection came at the recommendation of Greenberg Traurig, which has been Rubicon and Crestview's counsel for several years. [Finding of Fact Nos. 28, 43, & 44.] Subsequently, during Burns's tenure, Rubicon and Crestview micro-managed Burns's efforts to sell the Debtor's assets; for example, they required all emails with a "red flag" status to be forwarded to them. [Finding

of Fact No. 33.] Additionally, the loan provided by Rubicon and Crestview, which allowed them to oust the former board members, also paid Burns's salary and covered other operational expenses. [Finding of Fact No. 25.] The loan provided by Rubicon and Crestview was also attached to a non-refundable commitment fee of 3%, paid by—not surprisingly—the Debtor. [Finding of Fact No. 26.] From that time forward, Rubicon and Crestview had even greater control over the Debtor. For example, in February of 2007, budgets and "action plans" prepared by Burns were being sent to these two shareholders. [Finding of Fact No. 34.]

Rubicon and Crestview's control over the Debtor is further evidenced by the other shareholders' inaction. If Rubicon and Crestview's allegations that they were mere shareholders with no control over the Debtor were true, then there would have been some evidence of involvement by the other shareholders in the turnover of the board or the sale of assets in June of 2008. As no such involvement has been shown, this Court can only conclude that Rubicon and Crestview exercised control over the Debtor.

Finally, Rubicon and Crestview's assertion that the Court's designee must have had day-to-day management over the Debtor extends the law too far. First, as noted earlier, the law intentionally refrains from defining control, which suggests that day-to-day operational control is not required. Second, the decisions wherein the courts cited day-to-day oversight as evidence of control involved circumstances where different individuals exerted a spectrum of influence over a corporation, where the courts were forced to choose between a designee with the absolute minimum of control and a designee with almost total control. *See, e.g.*, *In re Muy Bueno*, 257 B.R. at 846; *In re King Brand Food Prods., Inc.*, 52 B.R. at 110. Rubicon and Crestview's control over the Debtor was wide ranging and, at times, absolute during the company's short life span. *In re Muy Bueno Corp.* held that the

31

"designation decision rests within the discretion of the court." 257 B.R. at 848 (citing *In re Little's Motor Co., Inc.*, 53 B.R. 635, 637 (Bankr. N.D. Ala. 1985)).  Therefore, this Court may recognize the control exerted by Rubicon and Crestview even given the absence of a statutory standard for control.

### 4.    Burns was merely Rubicon and Crestview's instrument used to control the Debtor.

Burns, the CRO from January of 2007 until May of 2008, resigned long before the Debtor's bankruptcy petition was filed. [Finding of Fact Nos. 23, 41.]  This fact alone should foreclose his eligibility to serve as the designee under Bankruptcy Rule 9001(5).  However, this Court also notes that—contrary to what Rubicon and Crestview would have this Court believe—Burns never independently had actual control over the Debtor; but rather, the evidence shows that he not only served at the pleasure of Rubicon and Crestview, but also that he was used as their instrument to control the Debtor.

Burns's title of CRO should not be given undue weight.  In *In re King Brand Food Products, Inc.*, a letter granting "possession and control" as well as the actual "keys to the business premises" were insufficient to find control. 52 B.R. at 110. In *In re Muy Bueno*, the court saw through an individual who was only superficially appointed to represent the company, finding that the actual individual in control must serve as the designee under Bankruptcy Rule 9001(5). 257 B.R. at 845.

Similarly, in this case, Burns's installation as CRO was fabricated in order to allow Rubicon and Crestview to exercise actual control over the Debtor.  First, Burns was approved to serve as CRO by a Board of Directors that was hand-picked by Rubicon and Crestview. [Finding of Fact No. 23.] Indeed, Rubicon and Crestview's counsel for several years, Greenberg Traurig, recommended Burns for the position; Greenberg Traurig's clients doubtlessly knew that Burns would act in the manner

expected and desired. [Finding of Fact No. 28.] Finally, Burns's compensation was funded by Rubicon and Crestview from the loan disbursed by those two entities in January of 2007. [Finding of Fact No. 25.]

In addition, Rubicon and Crestview directed Burns's actions at the Debtor. His tenure as CRO coincided with the execution of the amended Stockholders Agreement, which granted significantly greater power to Rubicon and Crestview. [Finding of Fact No. 24.] Additionally, Burns acted at the behest of Rubicon and Crestview's hand-picked Board of Directors. [Finding of Fact No. 31.]

Finally, Rubicon and Crestview were involved with the specific details of the Debtor's operations, beyond that of ordinary shareholders. For example, Rubicon and Crestview were involved with the discussion over the revised budget and action plan for the Debtor, [Finding of Fact No. 34.], duties that would normally fall solely to the CRO and the Board. Further, Rubicon and Crestview closely monitored Burns's work, going so far as requiring him to forward emails to them. [Finding of Fact Nos. 33, 34, & 36.] For all of these reasons, Burns, although a CRO in name, was more of a minion for Rubicon and Crestview, and therefore should not be appointed the Debtor's representative.

## V. THE TRUSTEE'S REQUEST TO APPOINT BOTH RUBICON AND CRESTVIEW

The Trustee has requested this Court to designate both Rubicon and Crestview as the joint representatives of the Debtor. This, the Court will not do. Once again, this Court focuses on the plain meaning of the language of Bankruptcy Rule 9001(5). Bankruptcy Rule 9001(5) expressly sets forth that this Court may designate "a controlling stockholder," not *controlling stockholders*. Because Bankruptcy Rule 9001(5) allows this Court to designate one—and only one—controlling stockholder, this Court may designate either Rubicon or Crestview—but not both. Therefore, as this Court finds that Rubicon was initially involved with the Debtor and holds a greater percentage of stock than

Crestview, [Finding of Fact No. 9], this Court designates Rubicon as the Debtor's representative. 15

U.S.C. § 80a-2(a)(9) (presuming control by "any person who owns . . . more than 25 per centum of the

voting securities of a company").

## VI. THE APPOINTMENT OF A SPECIFIC INDIVIDUAL AT RUBICON TO, AMONG OTHER THINGS, SIGN THE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS, TO TESTIFY AT THE MEETING OF CREDITORS, AND TO BE THE DEBTOR'S REPRESENTATIVE THEREAFTER

The final question is whether this Court has the power to appoint a specific individual within

Rubicon to serve as the Debtor's representative.  This Court agrees with *In re Muy Bueno, Corp.*,

which noted that the Code "says nothing about which human being" must be designated within a

corporation, and that "it is the court that selects the appropriate representative . . . not the corporate

debtor," and finally that Bankruptcy Rule 9001(5) "certainly does not give the debtor the right to

designate as agent someone who knows little or nothing about the debtor's recent affairs and

activities." 257 B.R. at 847-48 (citing *In re Gaslight Club, Inc.*, 782 F.2d 767, 771 (7th Cir. 1986)).

Additionally, this Court has the power under the Code to "issue any order . . . necessary or appropriate

to carry out the provisions of this title." 11 U.S.C. § 105(a).  This power may be used to ensure that

"a result that the Code clearly required" is achieved. *Perez v. Peake*, 373 B.R. 468, 488 (S.D. Tex.

2007) (citing *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 365 (2007)).  The Code requires the

Debtor's representative to appear at meetings of the creditors under 11 U.S.C. §§ 341 & 343 in order

to obtain the most accurate information possible from the Debtor's representative. *See In re Moore*,

309 B.R. 725, 726 (Bankr. N.D. Tex. 2002) (noting that the meeting allows creditors to "rigorously

question the debtor" and provide "valuable information regarding the debtor's financial situation"); *In*

*re Shulund*, 210 F. Supp. 195, 197 (D.C. Mont. 1962) (acknowledging that a function of the

examination at the creditors meeting is to "locate and protect the assets of the bankrupt's estate"); *In*

*re E. Utils. Investing Corp.*, 98 F.2d 620, 622 (3d Cir. 1938) (recognizing that the purpose is to "afford

. . . full information in connection [with the estate] . . . in order that the necessary steps may be taken

for its preservation").

Therefore, because Bankruptcy Rule 9001(5) requires a designee with full and material

information, and to ensure that Rubicon does not further attempt to evade disclosure of information

necessary to the Trustee's investigation—i.e. to ensure that the necessary disclosure required by the

Bankruptcy Code is achieved—this Court designates Leitch, a partner with Rubicon, to serve as the

representative of the Debtor.  Leitch signed the original resolution in December of 2005 allowing

additional stock certificates to issue and be sold, and this action led to the involvement of Crestview

and the other shareholders with the Debtor. [Finding of Fact No. 9]  Leitch also signed the General

Release Agreement and Settlement Agreement after McCormick and Chandler resigned. [Finding of

Fact Nos. 23 & 24.]  These agreements not only detailed the resignations of the former President and

CEO of the Debtor, but also dictated the future structure of the Debtor, and provided Rubicon and

Crestview with authority to appoint the entire board of the Debtor.  Leitch's long ties to the Debtor and

his direct involvement with some of the most consequential decisions involving the Debtor place him

in the position of the individual at Rubicon best able to serve as the Debtor's representative.

In the alternative, if Leitch is no longer at Rubicon and is therefore unable to serve as the

Debtor's representative, then the Court designates Crestview, and specifically Flink, as the Debtor's

representative.  While Crestview holds less stock than Rubicon, it still holds twenty-five percent of

the total stock in the Debtor, which is a significantly greater share than any other shareholder;

therefore, Crestview may be deemed a controlling shareholder. *See McGhee v. Joutras*, 908 F. Supp

566, 569 (N.D. Ill. 1995) (acknowledging a controlling shareholder holding twenty-five percent of

stock of a company); 15 U.S.C. § 80a-2(a)(9). Crestview, like Rubicon, was involved in key decisions throughout the Debtor's existence and among the individuals at Crestview involved with this corporation, Flink is the most knowledgeable about the Debtor's affairs. Flink was directly involved with the amendments to the Stockholders Agreement and the directions given to Hendrix. [Finding of Fact Nos. 16 & 17.] Additionally, Flink was often copied on emails discussing the day-to-day minutiae concerning the Debtor, which reflects his significant level of involvement and thus extensive knowledge about the Debtor. [Finding of Fact Nos. 22 & 36.] Because of these circumstances, the Court is confident that if Leitch is unable to serve, Flink can ably take his place.

Finally, it appears that Rubicon and Crestview hired Burns to prepare proposed Schedules and Statement of Financial Affairs in the hope of convincing this Court to appoint Burns as the Debtor's representative. [Finding of Fact Nos. 54 & 55.] Their trial strategy will not work. This Court will not appoint Burns for the reasons stated herein. The Court notes that in his closing arguments, counsel for the Trustee, after arguing for this Court to designate Rubicon and Crestview as the representative of the Debtor, stated that if the Court made such a designation, the Trustee would not object to these two companies then putting Burns on their payroll so that he could testify at the meeting of creditors. The Court expressly rejects this approach. The Court directs Leitch or, alternatively, Flink, to testify at the meeting of creditors and serve as the Debtor's representative in every other respect. Burns departed from the scene four months prior to the filing of the petition, and this Court believes that he should not return to the stage. Leitch, and, in the alternative, Flink—unlike Burns—have access to documents vital to the investigation of the Debtor's affairs as well as superior knowledge of the Debtor since its inception, and are already employed by Rubicon and Crestview.

## VII. CONCLUSION

In the first instance, this Court holds that the plain meaning of Bankruptcy Rule 9001(5) requires it to designate a "person" having ties to the Debtor as of the petition date from within the categories found in Bankruptcy Rule 9001(5). Because Rubicon and Crestview were the Debtor's controlling shareholders on the filing date, this Court may designate one of them, but not someone like Burns, who does not fall within any of Bankruptcy Rule 9001(5)'s enumerated categories nor had any ties to the Debtor on the date of the filing of the bankruptcy petition.

Alternatively, even if this Court is not confined to applying Bankruptcy Rule 9001(5) on the petition date, and may also focus on pre-petition activities and the "persons" who were involved in these activities, this Court nevertheless holds that Rubicon or Crestview should be designated as the Debtor's representative. The record reflects that Rubicon and Crestview each have substantial knowledge about the Debtor's pre-petition affairs in general and the pre-petition sale of its assets in particular. [Finding of Fact Nos. 33 & 59.] The record also reflects that Rubicon and Crestview exercised extensive control over the Debtor's affairs—ranging from forcing the resignation of its original officers, to hand-picking all the members of the board, to orchestrating the sale of the company's assets, to directing how the proceeds of the sale were distributed, including certain distributions to themselves and their law firm, Greenberg Traurig. [Finding of Fact No. 58.] If these actions do not constitute control, then nothing does.

Moreover, even if Burns did have some control over the Debtor's affairs during his tenure as CRO, the amount of his control does not surpass the control possessed by Rubicon and Crestview. To the extent that control of a company involves working up action plans and budgets—which Burns clearly was doing—such control does not amount to much when there are no employees to carry out

37

those plans or meet those budgets. [Finding of Fact No. 32.] Indeed, Burns's control, to the extent he had any, is dwarfed by the control exercised by Rubicon and Crestview.  While he was writing up action plans for a company with no operations, Rubicon and Crestview were orchestrating the sale of substantially all of the Debtor's tangible assets and the distribution of the sale proceeds therefrom. [Finding of Fact Nos. 45 & 48.] Under these circumstances, where there is more than one "person" who was exercising control prior to the filing of the petition, the Court, pursuant to Bankruptcy Rule 9001(5), has the discretion to designate which of these controlling "persons" should serve as the representative of the debtor. This Court concludes that both Rubicon and Crestview had substantially more pre-petition control than Burns over the Debtor and that it would be inappropriate to designate Burns as the Debtor's representative.

Finally, Rubicon and Crestview depict Burns as independent when in fact he was nothing more than their "bagman." Burns was appointed by a board whose members were hand-picked by Rubicon and Crestview, who in turn had obtained Burns's name from Greenberg Traurig—which had represented Rubicon and Crestview for years.  Burns was the ultimate minion for Rubicon and Crestview right up to the point when he "un-resigned" for an instant in order to sign a power of attorney for Kern (SRR's President) to execute the documents necessary to effectuate the sale of the Debtor's assets. [Finding of Fact No. 42.] If either Rubicon or Crestview are designated to serve as the Debtor's representative, they will have a duty to honestly disclose information Burns does not have, to wit: the negotiations over the sale price of $13.15 million, why the sale proceeds were distributed in the manner that they were, and who determined which unsecured creditors—such as Greenberg Traurig—would be paid and which unsecured creditors would not. This Court understands the desire of Rubicon and Crestview to avoid having to answer for these questionable payments to

unsecured creditors, but this Court will not risk undermining the integrity of the bankruptcy process. Therefore, this Court exercises its discretion under Bankruptcy Rule 9001(5) and holds that in the first instance, Rubicon must serve as the representative of the Debtor and Leitch must be the individual from Rubicon who takes the actions necessary to fulfill Rubicon's duty as the Debtor's representative. Alternatively, if Leitch is no longer at Rubicon, then Crestview must serve as the representative of the Debtor and Flink must be the individual from Crestview who takes the actions necessary to fulfill Crestview's duty as the Debtor's representative.

For the foregoing reasons, the Motion is granted in part and denied in part, insofar as the Court is appointing only one of the shareholders, but not both; and the Objection is overruled in its entirety. An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 26th day of June, 2009

Jeff Bohm
United States Bankruptcy Judge